Rose Michelle 08.20.20

1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4                         - - -

5     MICHELLE ROSE,            :

6               Plaintiff,  :

7        vs.             : Case No. 1:20-cv-00132

8     UNIVERSITY HOSPITALS,    :

9     et al.,                  :

10              Defendants. :

11                        - - -

12                   August 20, 2020

13                 Remote Deposition of

14                   Michelle Rose

15

16

17            the Plaintiff herein, called by the
      Defendant for cross-examination under the
18    applicable Rules of Ohio Civil Court Procedure,
      taken before me, Linda A. Schilt, a Registered
19    Professional Reporter and Notary Public in and for
      the State of Ohio, taken pursuant to Notice, at the
20    home of Michelle Rose, 1690 Lake Crest Drive,
      Roaming Shores, Ohio 44084, on Thursday, August 20,
21    2020, commencing at approximately 2:00 p.m., and
      concluding at approximately 5:30 p.m.
22                        - - -

Rose Michelle 08.20.20

25    since '99.  Take me through just in general the

11

1    gaps.

2            A.    I was off of them for a long time.

3    And then when this whole process started with work

4    and my father's diagnosis with the cancer and

5    stuff, that's when it all started probably in

6    August of '17.

7                  THE COURT REPORTER:   Counsel, I

8    need a clarification.

9                  Did you say your father's cancer?

10                 MS. ROSE:   Yes.

11   BY MR. CAMPBELL:

12           Q.    You're saying that caused you to

13   need some medication, your father's cancer?

14           A.    No.  It actually started with

15   work-related issues.

16           Q.    Okay.  We'll talk about those and

17   we'll see where it went after that.

18                 So let me ask you your current

19   state, are you currently approved and receiving

20   benefits under the Social Security Disability

21   Insurance program?

Rose Michelle 08.20.20

22          A.      Under what program, Social Security

23    Disability?

24          Q.      SSDI, Social Security Disability

25    Insurance program.

                                                    12

 1          A.      Insurance?  Are you asking if I'm on

 2    disability or are you asking if I'm covered under

 3    insurance there?

 4          Q.      Disability.  Are you familiar with

 5    the term Social Security Disability Insurance,

 6    SSDI?

 7          A.      I am on disability.  I don't know

 8    where the word insurance comes into play there, but

 9    I do collect a disability check.

10          Q.      Okay.  And we were trying to get the

11    file for that, so do you know the attorney who

12    helped with that filing?

13          A.      Hoagland Law Firm.

14          Q.      Did you ask the law firm to get you

15    the file?

16          A.      I'm sorry?

17          Q.      Have you asked your lawyer to get

18    you the file or information on your disability?

19          A.      No.  Every time I call there, all I

                          Page 13

Rose Michelle 08.20.20

20    would get was their assistant and couldn't get a

21    call back from the attorneys about anything.  And

22    then finally received my first check automatic

23    deposit into my accounts.

24         Q.    Okay.  And do you know the date when

25    your disability commenced, when they found you were

                                                      13

1    first disabled?

2         A.    I do believe it was November 27th of

3    2017.

4         Q.    Okay.  And did you ask for that date

5    or how did that come about?

6         A.    That was the date that I had my

7    reconstructive knee surgery.

8         Q.    Okay.  And do you believe that is

9    the date that you became disabled?

10        A.    That is the date that they -- they

11    put as disabled.

12        Q.    Okay.  Well, do you agree with it or

13    not?

14        A.    I have no idea.

15        Q.    You don't know if -- I guess, do you

16    know if you asked the SSDI or the disability

Rose Michelle 08.20.20

17  program to make that the first day of your

18  disability or not?

19        A.    No.  He asked for all my medical

20  records, the judge, and I gave him all the medical

21  records.  He reviewed them and that's the date that

22  he said that I was disabled from.

23        Q.    Okay, okay.  So just -- we'll leave

24  it with this.  Just so I understand, do you agree

25  that -- first of all, the disability standard means

                                                    14

1   in typical terms you can't work, right?

2         A.    Correct.

3         Q.    Okay.  Do you agree that since

4   November 27, 2017, you've been unable to work due

5   to your knee and other issues?

6         A.    I was unable to do the work that I

7   was doing.

8         Q.    So you agree or not?  Do you agree

9   with the judge?

10        A.    Yes, I agree with the judge.

11        Q.    Okay.  And so let me ask you one

12  more question as to it.  What is your understanding

13  of your disability that they approved?  Is it just

14  your knee or are there other issues?

Page 15

Rose Michelle 08.20.20

15          A.      There's -- I believe there's other

16   issues.

17          Q.      What are those?

18          A.      I don't know what he put in there.

19          Q.      Okay.  You don't --

20          A.      My mental status.

21          Q.      Okay.  Anything else?

22          A.      The fibromyalgia.

23          Q.      Okay.  Anything else?

24          A.      Not without the paperwork, I don't

25   know.

                                              15

1          Q.      Okay.  Could you, after this

2    deposition, could you email me your attorney's name

3    from -- and contact information from this

4    disability program?

5          A.      Yes.

6          Q.      Okay.  And then would you agree to

7    give us a release to get his file?  You would

8    obviously get a copy of it as well.

9          A.      Yes.  Absolutely.

10          Q.      Okay, okay.  Thank you.  Okay.  Just

11   my question then is:  You said knee, mental status,

Rose Michelle 08.20.20

12  fibromyalgia.  What do you mean by mental status?

13      A.    Mental status, I had to be evaluated

14  by psychiatrists due to the issues at hand at work.

15  I made a comment about committing suicide and I was

16  put off on administrative leave from work due to

17  that.  And they would not allow me to return to

18  work until I was evaluated and treated by a

19  psychiatric doctor.  And then I also still had to

20  follow up with a doctor at PsychBC for that as

21  well.

22      Q.    Okay.  But do you know was there any

23  diagnoses as to your mental status?  Did they

24  conclude that there was any -- that you had

25  depression or any other diagnosis that you're aware

                                                  16

1  of?

2      A.    Yeah.  Depression and other things.

3  That's why I'm on the medications I'm on.

4      Q.    Okay, okay.  And then let me just

5  ask you as to have you been working since January

6  1, 2018?  Have you had any work?

7      A.    No.  Have I applied?  Yes.

8      Q.    You have applied?

9      A.    Yes.

Page 17

Rose Michelle 08.20.20

5    against University Hospitals Physician Services?

6         A.    Yeah, I'm sure it probably was.

7               MR. CAMPBELL:   Jeff, if you could

8    take us through, turn to page 2 just so Ms. Rose

9    sees each page.

10              Okay, we're going through your

11   claims and then if we could turn to page 3.  And

12   then if we could go to page 4.

13              If you could look -- if you could

14   highlight, Jeff, under number five, below C, the

15   one, two, the third paragraph, if you could

16   highlight that first sentence in the third

17   paragraph below 5C, I am not requesting -- no, no.

18   Third paragraph.  The last paragraph on the page.

19   BY MR. CAMPBELL:

20        Q.    Ms. Rose, I was just taking you to

21   the sentence, I am not requesting any back pay

22   and/or future pay as I was approved for SSDI, do

23   you see that.

24        A.    Yes.

25        Q.    Is that an accurate statement?

                                                    19

1         A.    I am requesting -- first of all, I'm

Rose Michelle 08.20.20

2    not an attorney.  I don't know how this works.

3    Okay?  Everybody keeps wanting to say that just

4    because I'm on disability, that I'm not due any

5    money, regardless of the fact they violated my FMLA

6    rights.  They did a lot of other things.

7                   I don't know how to put dollar

8    amounts.  They discriminate -- they discriminate

9    against my disability.  I don't know how that

10   works.  I had to live off of credit cards for two

11   years until I got my disability.  I had no job.  I

12   lost my home.  I had to sell my house because I

13   could no longer pay the mortgage.

14                  So there's a lot of damages.  So --

15        Q.     Ms. Rose --

16        A.     -- back pay, or whatever, it's not

17   labeled as back pay.  I am suing them for wrongful

18   termination.  I'm suing them for violating my FMLA

19   rights.  I am suing them for discrimination against

20   my disabilities, my mental and physical pain,

21   suffering, anguish that I went through.  Publicly

22   humiliating me the way they terminated me, which

23   goes against their own policies.

24                  So there's a lot of different things

25   that I am suing them for that have nothing to do

Page 21

Rose Michelle 08.20.20

9   not make answers, okay.  So the question is very

10  simple.  You are getting disability benefits based

11  on you claiming you're disabled since November 27,

12  2017?

13         A.     Yes.

14         Q.     My question is very simple.  Is it

15  your testimony here today that despite you

16  receiving disability benefits, that you were

17  physically able to return to work at University

18  Hospitals on February 15, 2018?

19         A.     Yes, I could have.  And I could have

20  worked while on my disability.

21         Q.     Okay.  So it's your testimony that

22  you are able to work your former position at

23  University Hospitals?

24         A.     I don't think it has anything to do

25  with the position.  It has to do with --

                                                    27

1          Q.     I'm asking you.  I don't care what

2   your disability is.  I'm asking you, do you believe

3   you've been able to perform your former role at

4   University Hospitals at all times since November

5   27, 2017 to the present?

Page 29

Rose Michelle 08.20.20

6          A.     No.  I couldn't do it November 27,

7    2017.

8          Q.     Okay.  How about as of January 1,

9    2018 to the present, could you have done it?

10         A.     Under the Social Security Disability

11   work program, yes.

12         Q.     Meaning that -- but your job was

13   full-time, you could only earn so much income per

14   year, correct?

15         A.     Correct.

16         Q.     So you couldn't --

17                THE COURT REPORTER:   I'm sorry, I

18   didn't hear your question.

19         Q.     You couldn't have worked full-time

20   since January 1, 2018, correct?

21         A.     Correct.

22         Q.     Okay.  So you are agreeing with the

23   Social Security Disability Insurance finding of

24   November 27, 2017 disability, right?

25         A.     I agree that that's the date of my

                                                    28

1    corrective knee surgery, yes.

2          Q.     Okay.  Well, I'm asking you to agree

3    that that is the first date that you became

Page 30

Rose Michelle 08.20.20

4   disabled, and aside from being able to work within

5   the constraints of SSDI, you could not work, right,

6   since that date?

7         A.    According to the judge, no.

8         Q.    We'll leave it at that, according to

9   the judge.  And you are receiving those benefits

10  that the judge awarded you, right?

11        A.    Yes, I am.

12        Q.    Just so the record is clear, are you

13  saying that the judge is wrong or not today, yes or

14  no?

15        A.    No, I'm not saying he's wrong.

16        Q.    Okay, okay.  Thank you.

17        A.    I'm saying --

18        Q.    That was my question.

19        A.    -- I could have returned back to

20  work, not full-time and a different position within

21  University Hospitals that I was employed for 13

22  years.

23        Q.    Okay, okay.  In a different

24  position, in a part-time position, right?

25        A.    Whatever the guidelines are for

29

Page 31

Rose Michelle 08.20.20

23    workers' compensation claim?

24          A.    No.  Not that I ever recall.

25          Q.    Okay.  Have you ever filed for

                                                    31

1    bankruptcy?

2          A.    No.

3          Q.    Have you in the last seven years had

4    any criminal convictions?

5          A.    No.

6          Q.    And then as to this, briefly talk

7    about your work history.  Why don't you just tell

8    me what were the approximate dates of your

9    University Hospitals employment, beginning and end?

10          A.    April of 2004 or '5, one of the two,

11    and December 20, 2017.

12          Q.    Okay.  And just briefly, prior to

13    your employment prior to UH, did you work in

14    managing a doctor's office prior to UH?

15          A.    Prior to working for UH what?

16          Q.    Did you ever work in a doctor's

17    office, any doctor's offices before joining UH?

18          A.    Yes.

19          Q.    Okay.  Were you ever -- prior to UH,

Rose Michelle 08.20.20

18      Q.      Okay.  Did you file any lawsuit?

19      A.      No.  They didn't wrongfully

20  terminate me.  They didn't violate my FMLA right.

21      Q.      Okay.  Did you get discharged by any

22  other employers, other than UH and the Clinic?

23      A.      Not that I can recall.  I worked for

24  a temp agency prior to that and they wanted to keep

25  me, because the doctor loved my work, but it was a

                                                    33

1  temp agency and it was for Metro Hospital and

2  that's when I was hired in at University Hospitals.

3  That's the reason I left them.

4      Q.      Okay.  Let me ask you to go into --

5      A.      And prior to that, it was all like

6  fast food prior to that.

7      Q.      Okay.  Let me ask you then a little

8  bit about some of the general background with

9  respect to your employment with University

10  Hospitals.

11              So it's your recollection that you

12  were employed for approximately 13 years by

13  University Hospitals?

14      A.      Yes.  I believe it was 13.

Rose Michelle 08.20.20

15      Q.     Okay.  What different positions did

16   you hold?  First of all, let me take you just so we

17   can have --

18              MR. CAMPBELL:   Jeff, could you see

19   if you have -- it's marked exhibit Change in Title.

20              MR. MAIER:   Got it.

21              MR. CAMPBELL:   Okay.

22              MR. MAIER:   There you go.

23   BY MR. CAMPBELL:

24      Q.     Thank you.  Ms. Rose, do you

25   recognize this document?

                                            34

1       A.     Yes.

2       Q.     Okay.  Is this document -- I guess,

3    first of all, it's dated August 7, 2017?

4       A.     Correct.

5       Q.     And based on this document, it says

6    as of September 3, 2017, your position, your title

7    was going to be practice lead.  Did I read that

8    right?

9       A.     Yes.  Practice lead.

10      Q.     Okay.  Is that the position that you

11   held at the time of your discharge from University

12   Hospitals?

                        Page 37

Rose Michelle 08.20.20

13      A.      I believe so, yeah.

14      Q.      Okay.

15      A.      They changed all manager

16   (indiscernible.)

17              THE COURT REPORTER:   I'm sorry,

18   what?  What did you say, something manager?

19      A.      They changed all managers' title to

20   practice lead.

21      Q.      Okay.  And did you report to Cindy

22   Clark?

23      A.      She was my supervisor, yes.  My

24   direct supervisor.

25              MR. CAMPBELL:   If we could, that

                                                    35

1    will be marked as Exhibit 3.  If you could take

2    that down.

3                         - - -

4               Thereupon, a document was marked for

5    purposes of identification as Rose Exhibit 3.

6                         - - -

7    BY MR. CAMPBELL:

8       Q.      Tell us -- tell us, Ms. Rose, what

9    were your general duties in that position?

Page 38

Rose Michelle 08.20.20

13          A.      I believe so, yeah.

14          Q.      Okay.

15          A.      They changed all manager

16      (indiscernible.)

17                  THE COURT REPORTER:   I'm sorry,

18      what?  What did you say, something manager?

19          A.      They changed all managers' title to

20      practice lead.

21          Q.      Okay.  And did you report to Cindy

22      Clark?

23          A.      She was my supervisor, yes.  My

24      direct supervisor.

25                  MR. CAMPBELL:   If we could, that

                                                    35

1      will be marked as Exhibit 3.  If you could take

2      that down.

3                           - - -

4                  Thereupon, a document was marked for

5      purposes of identification as Rose Exhibit 3.

6                           - - -

7      BY MR. CAMPBELL:

8          Q.      Tell us -- tell us, Ms. Rose, what

9      were your general duties in that position?

Rose Michelle 08.20.20

10          A.     Who knows.

11          Q.     You don't know?  You can't tell me

12   as practice lead what your duties were?

13          A.     No, we can't.  Because UH changed it

14   on us at the drop of a hat due to supposedly some

15   law that came out that if employees didn't make X

16   amount of dollars on salary, then they couldn't be

17   salaried, they had to be hourly.

18                 Well, that didn't pertain to me.  I

19   made three times the amount required.  But UH

20   decided to change everybody's role and yet they

21   didn't come out with a new job description.  They

22   were working -- quote, unquote -- working on it.

23                 So they expected us to do the same

24   work, the same amount of work, and the same

25   everything, but yet they were changing our title.


                                                    36

1           Q.     Okay.  All I'm asking you to do is

2    give me a brief summary of what was the work that

3    you --

4           A.     I just told you I don't know.  They

5    never came up with a job description.

6           Q.     Okay, okay.  So you don't know --

7           A.     There was a lot of emails back and

                        Page 39

Rose Michelle 08.20.20

8   forth that UH should provide for you where I was

9   requesting that information.

10        Q.    Okay.  Let me ask you this:  When

11  you went into work after September 3, 2017, what

12  were you doing?  Give us a sample of your day.

13        A.    It just varied.  I would go in the

14  office.

15        Q.    Give us some examples.

16        A.    I would go in the office, the doctor

17  would come to me if there was a problem he wanted

18  taken care of.  I would take phone calls, I would

19  order things for the office, I would deal with

20  issues if an employee was having some issues.  Help

21  on the phones if they got busy.  Many different

22  things.

23        Q.    Okay.  Did you consider yourself a

24  supervisor or manager?

25        A.    Did I consider myself a supervisor

                                              37

1   or manager?

2         Q.    Yeah.

3         A.    No, I was the practice lead.

4         Q.    Okay.  Did anybody report to you?

Rose Michelle 08.20.20

5       A.      No.

6       Q.      Could you issue discipline?

7               I didn't hear her answer.  Ms. Rose,

8    did you answer?

9       A.      What was the question?

10      Q.      Could you issue discipline?

11      A.      I don't know.  That was a question

12   that we didn't understand.

13      Q.      Okay.  What doctors practiced in the

14   office where you were based?

15      A.      What doctors what?

16      Q.      What doctors practiced in the office

17   that you were the lead in?

18      A.      Dr. Kent Knauer.

19      Q.      Okay.  Can you spell that last name?

20      A.      K-n-a-u-e-r.

21      Q.      Were there any other doctors that

22   practiced in that office on a regular basis in

23   2017?

24      A.      No.

25      Q.      Did you report to the doctor?

                                                    38

1       A.      What do you mean by report to the

2    doctor?  I don't know what you mean by that.

Page 41

Rose Michelle 08.20.20

5      A.     No.

6      Q.     Could you issue discipline?

7             I didn't hear her answer.  Ms. Rose,

8   did you answer?

9      A.     What was the question?

10     Q.     Could you issue discipline?

11     A.     I don't know.  That was a question

12  that we didn't understand.

13     Q.     Okay.  What doctors practiced in the

14  office where you were based?

15     A.     What doctors what?

16     Q.     What doctors practiced in the office

17  that you were the lead in?

18     A.     Dr. Kent Knauer.

19     Q.     Okay.  Can you spell that last name?

20     A.     K-n-a-u-e-r.

21     Q.     Were there any other doctors that

22  practiced in that office on a regular basis in

23  2017?

24     A.     No.

25     Q.     Did you report to the doctor?

                                              38

1      A.     What do you mean by report to the

2   doctor?  I don't know what you mean by that.

Page 41

Rose Michelle 08.20.20

3          Q.     Well, you identified one person who

4    was your supervisor and I'm asking what was the

5    doctor's role with respect to you?

6          A.     He paid 100 percent of my salary.

7    100 percent of my health benefits.

8          Q.     Did he set the terms and conditions

9    of your employment or did your supervisor?

10         A.     I don't understand what you're

11   asking.

12         Q.     I don't think it's that difficult.

13   I mean, was he somebody who could give you

14   directives that you were required to follow?

15         A.     Absolutely.  It's his practice.

16         Q.     Okay.  Well, I asked you the

17   question, you said you didn't understand what I was

18   asking.

19                And at the time of your discharge,

20   how were you paid, hourly or salary?

21         A.     At the time of the discharge,

22   hourly.

23         Q.     And how much per hour?

24         A.     I don't know.

25         Q.     Okay.  And prior to 2017, okay -- so

Page 42

Rose Michelle 08.20.20

1   we're going to talk about 2017 here coming up, and

2   we'll go into detail, but I want to ask you, during

3   your 12 years of employment prior to 2017, I just

4   want to ask you a couple of questions about it,

5   okay?  Just in general, were you happy at

6   University Hospitals?

7           A.      Very happy.

8           Q.      Okay.  And did you ever, during

9   those years up to 2017, ever have to file any

10  complaints with the human resources department?

11          A.      No, I don't think so.

12          Q.      Okay.  And then during those years,

13  did you ever have to take any FMLA leave?

14          A.      I don't -- yeah, I think I have for

15  other surgeries.  I can't remember.

16          Q.      Okay.  But it sounds like you're

17  familiar with FMLA and if you needed to take FMLA,

18  you knew how to ask for it and you knew your

19  rights?

20          A.      Yes.

21          Q.      Okay.  And then prior to 2017, I

22  just want to ask you, I found one of your 2017

23  emails that you described yourself as loud,

Rose Michelle 08.20.20

24   demanding and willing to fight.  And it was willing

25   to fight for your employees.  Is that an accurate

                                                    40

1   description of yourself?

2                  THE COURT REPORTER:   Counsel, I'm

3   sorry.

4          A.     I'm sorry?

5                  THE COURT REPORTER:   Can you read

6   that again?  That she was wild, demanding, and

7   willing to fight?

8          Q.     That you were loud, l-o-u-d,

9   demanding, and willing fight; is that accurate?

10         A.     No, I don't recall that.  But, yes,

11  I will stand up for my employees.

12         Q.     Okay.  And did you do that during

13  the course of your employment at UH, all 13 years?

14         A.     Not if I wasn't in management.

15         Q.     Okay.  How long were you in

16  management, how many years?

17         A.     Seven.

18         Q.     Okay.  All seven of those years, I

19  assume, if you thought there was a problem, you

20  would speak up and voice your opinion?

21         A.     No, not quite so.  If it pertained

Rose Michelle 08.20.20

22    to my employees or if it pertained to my office.

23    You have to remember, I take commands from the

24    doctor who pays 100 percent of my salary and he

25    tells me to do something, I do it.

                                                    41

1          Q.    Okay.  My only question was:  Did

2    you raise issues, your opinions, prior to 2017?

3          A.    I don't know.  I mean -- yeah.  I

4    mean, that's a question that I have no idea.

5          Q.    Okay.  Let me ask you some simple

6    questions.  Were you ever suspended prior to 2017

7    by University Hospitals?

8          A.    Suspended?

9          Q.    Yes.

10         A.    Not that I ever recall.

11         Q.    Okay.  Prior to 2017, were you ever

12   discharged?

13         A.    From?

14         Q.    University Hospitals.  Did they try

15   to discharge you?  I assume the answer is no.  Did

16   they every terminate you?

17         A.    No, no.

18         Q.    Okay.  Did you suffer any type of

Page 45

Rose Michelle 08.20.20

22    to my employees or if it pertained to my office.

23    You have to remember, I take commands from the

24    doctor who pays 100 percent of my salary and he

25    tells me to do something, I do it.

                                                    41

 1            Q.      Okay.  My only question was:  Did

 2    you raise issues, your opinions, prior to 2017?

 3            A.      I don't know.  I mean -- yeah.  I

 4    mean, that's a question that I have no idea.

 5            Q.      Okay.  Let me ask you some simple

 6    questions.  Were you ever suspended prior to 2017

 7    by University Hospitals?

 8            A.      Suspended?

 9            Q.      Yes.

10            A.      Not that I ever recall.

11            Q.      Okay.  Prior to 2017, were you ever

12    discharged?

13            A.      From?

14            Q.      University Hospitals.  Did they try

15    to discharge you?  I assume the answer is no.  Did

16    they every terminate you?

17            A.      No, no.

18            Q.      Okay.  Did you suffer any type of

Rose Michelle 08.20.20

19    written disciplinary actions from 2004 through to

20    January 1, 2017?

21          A.    I'm sorry, can you say that again,

22    did I what?

23          Q.    Did you get any discipline --

24    discipline issued from 2004 until January 1, 2017?

25          A.    My first corrective action was

                                              42

1     October of 2017.  And that was a final warning.

2           Q.    So the answer is what?

3           A.    It was a final warning.  And

4     technically the way their policy works is you're

5     supposed to have a verbal warning, a written

6     warning, then you get put into corrective action,

7     then you get suspended, and then you get

8     terminated, according to their policy.

9           Q.    Okay, thank you for that.  Ms. Rose,

10    my question, I think you've answered it, but just

11    so the record is clear, you never got any

12    discipline from 2004 until January 1, 2017,

13    correct?

14          A.    Yes.  I had an October 2017

15    corrective action.

16          Q.    Okay.  Let me say again.  Maybe I'll

Rose Michelle 08.20.20

17    take out the January 1st.  How about December 31,

18    2016, do you understand what I'm saying?  From 2004

19    until December 31, 2016, you never were disciplined

20    by University Hospitals, correct?

21           A.    Not that I ever recall.

22           Q.    Okay, thank you for that.

23           A.    (Indiscernible) provided when I

24    asked for my employee file.

25           Q.    We will do that.  I just -- I'm

                                                        43

1     simply asking you today about your recollection of

2     those events.  So thank you for that.

3                 So before we take a break, I just

4     want to roll through a couple of the policies just

5     for the record.  I'm assuming as a seven or

6     eight-year management employee, that you're

7     familiar with University Hospitals' written

8     policies?

9           A.    As an employee we have to look at

10    the policies.

11           Q.    Okay.  You were familiar, that's my

12    only question.  Not a trick, I just wanted to know,

13    were you familiar with the policies?

Rose Michelle 08.20.20

17    take out the January 1st.  How about December 31,

18    2016, do you understand what I'm saying?  From 2004

19    until December 31, 2016, you never were disciplined

20    by University Hospitals, correct?

21            A.    Not that I ever recall.

22            Q.    Okay, thank you for that.

23            A.    (Indiscernible) provided when I

24    asked for my employee file.

25            Q.    We will do that.  I just -- I'm

                                                    43

 1    simply asking you today about your recollection of

 2    those events.  So thank you for that.

 3                 So before we take a break, I just

 4    want to roll through a couple of the policies just

 5    for the record.  I'm assuming as a seven or

 6    eight-year management employee, that you're

 7    familiar with University Hospitals' written

 8    policies?

 9            A.    As an employee we have to look at

10    the policies.

11            Q.    Okay.  You were familiar, that's my

12    only question.  Not a trick, I just wanted to know,

13    were you familiar with the policies?

Rose Michelle 08.20.20

14        A.      Some of them.  There was many of

15  them.

16        Q.      Let's look at a couple.

17        A.      Mind you, those are policies written

18  by UH hospital -- and quote, unquote -- and my

19  witnesses will testify to this, when they are a

20  risked position, as Dr. Knauer was, we fall under

21  the UH umbrella that he is allowed to bend the

22  policies the way he sees fit in his practice.

23        Q.      Okay.  Thank you.  I just want you

24  to verify some written policies.

25                MR. CAMPBELL:  So, Jeff, if we

                                                    44

1  could first put up Exhibit HR-19.

2        Q.      Ms. Rose, I'm assuming you

3  understood there was a written Family Medical Leave

4  absence policy.

5        A.      FMLAs, yes.

6        Q.      Okay.  That will be marked as

7  Exhibit 4.

8                        - - -

9                Thereupon, a document was marked for

10  purposes of identification as Rose Exhibit 4.

11                        - - -

Page 48

Rose Michelle 08.20.20

14        A.      Some of them.   There was many of

15   them.

16        Q.      Let's look at a couple.

17        A.      Mind you, those are policies written

18   by UH hospital -- and quote, unquote -- and my

19   witnesses will testify to this, when they are a

20   risked position, as Dr. Knauer was, we fall under

21   the UH umbrella that he is allowed to bend the

22   policies the way he sees fit in his practice.

23        Q.      Okay.  Thank you.  I just want you

24   to verify some written policies.

25               MR. CAMPBELL:  So, Jeff, if we

                                                    44

1   could first put up Exhibit HR-19.

2        Q.      Ms. Rose, I'm assuming you

3   understood there was a written Family Medical Leave

4   absence policy.

5        A.      FMLAs, yes.

6        Q.      Okay.  That will be marked as

7   Exhibit 4.

8                      - - -

9               Thereupon, a document was marked for

10  purposes of identification as Rose Exhibit 4.

11                     - - -

Page 48

Rose Michelle 08.20.20

12              MR. CAMPBELL:   Could you put up the

13  next one, HR-20.  Exhibit HR-20.

14  BY MR. CAMPBELL:

15        Q.    Ms. Rose, did you understand there

16  was a written antiharassment and nondiscrimination

17  policy at UH?

18        A.    No.  I can't say I knew this one,

19  no.

20        Q.    Okay.  Did you understand that

21  harassment and discrimination were prohibited by

22  University Hospitals?

23        A.    I'm sorry, say that again.

24        Q.    Did you understand that harassment

25  and discrimination were prohibited by the policies

                                              45

1   at University Hospitals?

2         A.    Harassment and discrimination?

3         Q.    Yes.

4         A.    Yes.  I know that's against the

5   rules.

6         Q.    Okay.

7               MR. CAMPBELL:   If we could, that

8   will be Exhibit 5.

Page 49

Rose Michelle 08.20.20

22  to my employees or if it pertained to my office.

23  You have to remember, I take commands from the

24  doctor who pays 100 percent of my salary and he

25  tells me to do something, I do it.

                                                    41

1          Q.    Okay.  My only question was:  Did

2  you raise issues, your opinions, prior to 2017?

3          A.    I don't know.  I mean -- yeah.  I

4  mean, that's a question that I have no idea.

5          Q.    Okay.  Let me ask you some simple

6  questions.  Were you ever suspended prior to 2017

7  by University Hospitals?

8          A.    Suspended?

9          Q.    Yes.

10          A.    Not that I ever recall.

11          Q.    Okay.  Prior to 2017, were you ever

12  discharged?

13          A.    From?

14          Q.    University Hospitals.  Did they try

15  to discharge you?  I assume the answer is no.  Did

16  they every terminate you?

17          A.    No, no.

18          Q.    Okay.  Did you suffer any type of

Rose Michelle 08.20.20

19    written disciplinary actions from 2004 through to

20    January 1, 2017?

21         A.    I'm sorry, can you say that again,

22    did I what?

23         Q.    Did you get any discipline --

24    discipline issued from 2004 until January 1, 2017?

25         A.    My first corrective action was

                                                          42

1     October of 2017.  And that was a final warning.

2          Q.    So the answer is what?

3          A.    It was a final warning.  And

4     technically the way their policy works is you're

5     supposed to have a verbal warning, a written

6     warning, then you get put into corrective action,

7     then you get suspended, and then you get

8     terminated, according to their policy.

9          Q.    Okay, thank you for that.  Ms. Rose,

10    my question, I think you've answered it, but just

11    so the record is clear, you never got any

12    discipline from 2004 until January 1, 2017,

13    correct?

14         A.    Yes.  I had an October 2017

15    corrective action.

16         Q.    Okay.  Let me say again.  Maybe I'll

                          Page 46

Rose Michelle 08.20.20

49

1               MR. CAMPBELL:   That will be

2     Exhibit 9.

3                         - - -

4               Thereupon, a document was marked for

5     purposes of identification as Rose Exhibit 9.

6                         - - -

7               BY MR. CAMPBELL:   If we could go

8     then to the final policy, HR-63, which will be

9     Exhibit 10.

10                        - - -

11              Thereupon, a document was marked for

12    purposes of identification as Rose Exhibit 10.

13                        - - -

14              MR. MAIER:   There you go.

15              MR. CAMPBELL:   Okay.

16    BY MR. CAMPBELL:

17         Q.    Have you seen HR-63, Professional

18    Behavior, before today, Ms. Rose?

19         A.    Yes.  That was mailed to me.

20         Q.    Okay.  That was part of your

21    discharge, correct?

22         A.    Yes.

Rose Michelle 08.20.20

23       Q.    Okay.  You understood that UH's

24  policy required all employees to treat each other

25  with respect?

                                          50

1       A.    I'm sorry, say that again.

2       Q.    You understood that UH policies

3  required all employees to treat each other with

4  respect?

5       A.    Absolutely.  Including supervisors

6  and HR.

7       Q.    Okay.  Including yourself, correct?

8       A.    Yes.

9       Q.    Okay.

10       MR. CAMPBELL:  If we could take

11  that down.  That will be Exhibit 10.

12       Ms. Rose, before we get into 2017,

13  why don't we take a short break.  It's 3:12.  What

14  time would you like to come back?  Is 3:20 okay?

15  Or what time would you like to get back?

16       MS. ROSE:  I mean, 10-minute break

17  is fine for me.  Five-minute break.

18       MR. CAMPBELL:  Linda, how long

19  would you like?  Do you want to go to 3:30, Linda,

20  or you want to -- you tell us.

Page 55

Rose Michelle 08.20.20

21          THE COURT REPORTER:   Ten minutes is

22   fine.

23          MR. CAMPBELL:   We're 3:13, so we'll

24   come back at 3:25, okay, Ms. Rose?

25          MR. ROSE:   Sounds good.

                                        51

1          MR. CAMPBELL:   Okay, thank you.

2          (A recess was taken.)

3   BY MR. CAMPBELL:

4          Q.   Thank you.  So, Ms. Rose, before we

5   get into the discipline, let me just ask you a

6   couple of questions about 2017.

7          First of all, did you have

8   intermittent leave under FMLA approved for your own

9   condition in 2017?

10          A.   I believe there was -- yes, there

11   was a total of three.

12          Q.   Okay.  I think the three was one

13   intermittent leave for your own medical condition,

14   one intermittent leave for your father, and then a

15   leave for your knee.  Are those the three?

16          A.   Yes.

17          Q.   Okay.  All were approved, ultimately

Rose Michelle 08.20.20

18    approved?

19         A.    One was denied, which was the one

20    for my knee was denied.  And she emailed me stating

21    that the doctor did not fill out his portion.  So

22    that was not approved until, I believe, the 10th of

23    December, if I recall.  I don't recall at this

24    time.  I have the denial letter, which was dated

25    December 4th.  And she stated via email that the

                                                      52

 1    doctor did not fill out his portion of the

 2    paperwork.  And it was during that time that HR

 3    accused me of working while on FMLA.

 4         Q.    Okay.  My questions right now are

 5    pretty simple, okay?  Let's just verify.  The

 6    intermittent leave for your father's condition was

 7    approved, right?

 8         A.    Yes.

 9         Q.    Under the FMLA, right?

10         A.    Yes.

11         Q.    The intermittent leave for your own

12    condition, I believe it was fibromyalgia, was

13    approved, correct?

14         A.    Yes.

15         Q.    And then the leave of absence for

Page 57

Rose Michelle 08.20.20

16    your knee surgery was ultimately approved, correct?

17          A.      In the long run it was.  It was not

18    approved until after the fact.  Yes, it was finally

19    approved.

20          Q.      Okay.  We've seen the exhibit.

21    We've already gone through the exhibit, first

22    exhibit in the deposition, correct?

23          A.      You neglected to put the letter up

24    that denied it, though.

25          Q.      Ms. Rose, I'm not going to argue

                                                          53

1    with you about every little point.  We saw that

2    your knee --

3          A.      It's pretty -- absolutely not.  That

4    was the time frame I was accused of working and I

5    wasn't on leave.  It was denied.  So it's pretty

6    important to the case.

7          Q.      Okay.

8          A.      So if you do not have that denial

9    letter, I'll be happy to send you a copy.

10          Q.      We'll get into it.  Thank you very

11    much.  So now let's go through some of the

12    documents I want to ask you about.

Rose Michelle 08.20.20

8    wrong way.  That I must stop and think how the

9    other person may read it and read into it

10   differently than what I mean by it.

11          Q.     Okay.  Then did you ever get

12   counseling regarding the proper chain of command

13   prior to this final written warning?

14          A.     Absolutely not.

15          Q.     Now, on the communication style,

16   most certainly you understood that somebody could

17   be upset by your email, even if you didn't intend

18   it to be that way?

19          A.     Yes.

20          Q.     And that's what she was talking to

21   you about?

22          A.     My supervisor had a conversation

23   with me about that, yes.

24          Q.     Well, as you said --

25          A.     Not human resources.

                                                          56

1           Q.     Okay.  Well, as you said, the doctor

2    was paying your salary and it was important that

3    you represent the doctor in an appropriate manner,

4    correct?

5           A.     I had to do what I was told by the

Page 61

Rose Michelle 08.20.20

11  two years by her direct manager, and most recently

12  in partnership with human resources, in relation to

13  her professional behavior, communication style, and

14  proper chain of command.

15          Did I read that right?

16      A.      You read it right, but it's

17  incorrect.

18      Q.      What is incorrect about it?

19      A.      I have never been coached over the

20  past two years about:  Her direct manager, and most

21  recently in partnership with human resources, in

22  relations to her professional behavior,

23  communication style, and proper chain of command.

24  Absolutely false.

25      Q.      Okay.  Did anybody speak to you

                                                    55

1  about professional behavior prior to this final

2  written warning?

3      A.      Absolutely not.

4      Q.      Did anybody speak to you about your

5  communication style prior to this written warning?

6      A.      The only conversation I had with my

7  supervisor was sometimes my emails come across the

Rose Michelle 08.20.20

 8    wrong way.  That I must stop and think how the

 9    other person may read it and read into it

10    differently than what I mean by it.

11          Q.     Okay.  Then did you ever get

12    counseling regarding the proper chain of command

13    prior to this final written warning?

14          A.     Absolutely not.

15          Q.     Now, on the communication style,

16    most certainly you understood that somebody could

17    be upset by your email, even if you didn't intend

18    it to be that way?

19          A.     Yes.

20          Q.     And that's what she was talking to

21    you about?

22          A.     My supervisor had a conversation

23    with me about that, yes.

24          Q.     Well, as you said --

25          A.     Not human resources.


                                              56

 1          Q.     Okay.  Well, as you said, the doctor

 2    was paying your salary and it was important that

 3    you represent the doctor in an appropriate manner,

 4    correct?

 5          A.     I had to do what I was told by the

                         Page 61

Rose Michelle 08.20.20

6   doctor, yes.

7          Q.    Wouldn't the doctor expect you or

8   want you to show others professionalism?

9          A.    Absolutely.

10         Q.    Okay.  And respect them, right?

11         A.    Absolutely.

12         Q.    Okay, okay.  So now let's go on to

13  paragraph two.  And it says, Michelle has continued

14  to have a very aggressive communication style.

15               Do you agree or deny that?

16         A.    Deny.

17         Q.    And then the Soarian/PCARM, what is

18  that?

19         A.    Soarian --

20               MR. CAMPBELL:   Wait, just for the

21  record.  Linda, just for the record, Soarian is

22  S-O-R-I-A-N/P-C-A-R-M (sic).

23         Q.    Ms. Rose, what is that?

24         A.    It was a launch of a new scheduling

25  program and billing program for UHPS.

                                                    57

1          Q.    You were told -- your office was

2   told when Soarian was going to be rolled out in

Rose Michelle 08.20.20

3    your office, correct?

4           A.      Initially we were given a date.

5           Q.      Then you were given a new date,

6    right?

7           A.      No.  It was kind of sprung on us at

8    the last moment.

9           Q.      Okay.

10          A.      Nobody in the office consulted with

11   myself as the manager and/or the doctor.  Neither

12   was consulted with on a date.

13          Q.      And you voiced your displeasure with

14   that date?

15          A.      No.  I voiced the displeasure from

16   Dr. Knauer with that date.

17          Q.      You did that with the entire allergy

18   department, correct?

19          A.      No.  They stated that the entire

20   allergy department has to go as one, and Dr. Knauer

21   had stated he is the senior when it comes to the

22   allergy department and felt that all communication

23   should go through him for decision-making.

24          Q.      My question is just simply:  This

25   second paragraph says that you advised the entire

Rose Michelle 08.20.20

24      A.      Correct.  Uh-huh.

25      Q.      Okay.  But you did not show your

88

1   final written warning to the doctor and ask him to

2   respond to HR on it, correct?

3           A.      No.  No, I didn't see a need for it.

4           Q.      Okay.  So let me ask you, after the

5   final written warning -- just so we're clear as to

6   the date as to this.  So let me ask you just in

7   terms of so I understand when you were at work and

8   when you were on your leave.

9               So your final written warning was

10   given to you on October 19, 2017, can we agree on

11   that?

12          A.      I don't have it in front of me, but

13   I believe so, yes.

14          Q.      Okay.  And you were terminated, I

15   believe, on December 20, 2017, right?

16          A.      Yes.

17          Q.      Okay.  What days were you out on

18   FMLA, was it beginning November 27, 2017 when you

19   were out on FMLA?

20          A.      No, sir.  I went out -- I believe

21   that October was a Friday, if I'm not mistaken, and

Page 97

Rose Michelle 08.20.20

22   I received a call about my father's -- I was -- I

23   was out of state and I received a call from the VA

24   Hospital on Saturday that my father had taken a

25   turn for the worse and was in the ICU.

                                                    89

1                   And I rushed home and I reached the

2    VA Hospital that Sunday, October 20th maybe, or

3    21st.  And I was on a continuous leave at the VA

4    with him since that Sunday.

5           Q.     So since -- through the date of your

6    termination?

7           A.     No, no.  My father passed away

8    November 4th.

9           Q.     So from October 21st until November

10   4th, when did you return to work again?  When do

11   you think you returned to work again?

12          A.     I do believe it was the 15th of

13   November.

14          Q.     Then you worked until the 27th when

15   you went out for your knee surgery?

16          A.     Yes.

17          Q.     So just so we're clear, and I'm

18   sorry about your father, but we're clear from after

Rose Michelle 08.20.20

19  your final written warning, was October 21st until

20  you think November 15th you were out on a leave?

21          A.      Yes.

22          Q.      Then from November 27th until your

23  discharge you were on a leave?

24          A.      I'm sorry, say that again.

25          Q.      From November 27th until your

                                                        90

1   discharge on December 20th you were on another

2   leave of absence?

3           A.      Yes.  My surgery date, yes.

4           Q.      Your surgery, okay.  And so we're

5   going to come back.  Why don't we take a short

6   break with that, we'll come back as to some of the

7   issues that led up to your termination.  So why

8   don't we -- it's 4:23.  Can we come back at 4:35,

9   does that work?

10                  MR. ROSE:   Yeah, that's fine for

11  me.

12                  MR. CAMPBELL:   Does that work for

13  everybody else on the call?

14                  MR. MAIER:   I'm good.

15                  (A recess was taken.)

16  BY MR. CAMPBELL:

Rose Michelle 08.20.20

17          Q.      Ms. Rose, we're back on the record.

18    When we left we talked about your date of

19    employment or your final two months of employment

20    what days you were on FMLA.  So let's talk about

21    that, first of all.  Your surgery was on November

22    27, 2017?

23          A.      Yes.

24          Q.      And you said that was what,

25    reconstructive knee surgery?

                                                    91

1           A.      Yes.

2           Q.      Okay.  And then you came back to

3     work on what day?  Did you come back to work

4     between November 27th and December 20th?

5           A.      Yes.  I believe it was -- whatever

6     the Monday was.  I believe it might have been the

7     17th or the 15th of December.  Trying to pull up a

8     calendar.

9           Q.      On December 12th and December 14th,

10    were you working on leave?

11          A.      On December what?

12          Q.      Twelfth and 14th.

13          A.      Okay.  I have to pull up a calendar,

Rose Michelle 08.20.20

17          Q.      Ms. Rose, we're back on the record.

18    When we left we talked about your date of

19    employment or your final two months of employment

20    what days you were on FMLA.  So let's talk about

21    that, first of all.  Your surgery was on November

22    27, 2017?

23          A.      Yes.

24          Q.      And you said that was what,

25    reconstructive knee surgery?

                                                    91

1           A.      Yes.

2           Q.      Okay.  And then you came back to

3     work on what day?  Did you come back to work

4     between November 27th and December 20th?

5           A.      Yes.  I believe it was -- whatever

6     the Monday was.  I believe it might have been the

7     17th or the 15th of December.  Trying to pull up a

8     calendar.

9           Q.      On December 12th and December 14th,

10    were you working on leave?

11          A.      On December what?

12          Q.      Twelfth and 14th.

13          A.      Okay.  I have to pull up a calendar,

                        Page 100

Rose Michelle 08.20.20

14    I'm sorry.  I believe it was the 12th.

15         Q.    Okay.  So you went back to work on

16    the 12th, and then you went on a leave again

17    December 15th; is that right?

18         A.    Excuse me.  The 11th.  I'm sorry, I

19    didn't see that was Saturday and Sunday.  Monday,

20    December 11th, I returned to work.

21         Q.    Okay.  And went back on a leave?

22         A.    On the 15th I went back to my

23    surgeon, because I had some issues, and he then put

24    me on a leave until January 15th.

25         Q.    Okay.  That's fair.  So let me then

                                              92

1    talk to you a little bit about, if you could --

2              MR. CAMPBELL:   Jeff, are you back?

3              MR. MAIER:   Yes, sir.

4              MR. CAMPBELL:   Okay.  Could you

5    bring up Exhibit Text - Don't Come to Work.

6              This will be Exhibit 16.

7                        - - -

8              Thereupon, a document was marked for

9    purposes of identification as Rose Exhibit 16.

10                       - - -

11    BY MR. CAMPBELL:

Page 101

Rose Michelle 08.20.20

14   I'm sorry.  I believe it was the 12th.

15          Q.     Okay.  So you went back to work on

16   the 12th, and then you went on a leave again

17   December 15th; is that right?

18          A.     Excuse me.  The 11th.  I'm sorry, I

19   didn't see that was Saturday and Sunday.  Monday,

20   December 11th, I returned to work.

21          Q.     Okay.  And went back on a leave?

22          A.     On the 15th I went back to my

23   surgeon, because I had some issues, and he then put

24   me on a leave until January 15th.

25          Q.     Okay.  That's fair.  So let me then

                                                            92

1    talk to you a little bit about, if you could --

2                  MR. CAMPBELL:   Jeff, are you back?

3                  MR. MAIER:   Yes, sir.

4                  MR. CAMPBELL:   Okay.  Could you

5    bring up Exhibit Text - Don't Come to Work.

6                  This will be Exhibit 16.

7                           - - -

8                  Thereupon, a document was marked for

9    purposes of identification as Rose Exhibit 16.

10                          - - -

11   BY MR. CAMPBELL:

Page 101

Rose Michelle 08.20.20

12        Q.      Just so we're clear, this is a

13   document you provided to us, Ms. Rose?

14        A.      I believe so, yes.

15        Q.      This is from the doctor, right?

16        A.      Yes.

17        Q.      This is the doctor telling you that

18   hey, don't show -- don't come in to work during

19   your FMLA leave, right?

20        A.      Yes.

21        Q.      So the doctor was giving you a heads

22   up, hey, you shouldn't be working, don't come in to

23   the office during your FMLA, right?

24        A.      He didn't say anything about

25   working.  He said don't come in to the office.

                                                    93

1        Q.      Okay.

2                MR. CAMPBELL:   Now, that will be

3   Exhibit 16.  If we can drop out of that one, Jeff.

4        A.      May I add something to that?

5                MR. CAMPBELL:   You can, but, Jeff,

6   if you can drop out of that.

7        A.      That was a scheduled appointment,

8   because not only did I work for him, he was also my

Rose Michelle 08.20.20

9    physician and immunologist for me.  So I had a

10   scheduled appointment with the doctor as a patient.

11          Q.    Well, he was telling you that -- he

12   was giving you a clear warning and advice not to be

13   coming in unless you had a doctor's appointment,

14   right?

15          A.    No.  He didn't say unless you have a

16   doctor's appointment.  He just said, heads up, all

17   eyes are on you.  I advise you not to come in.

18          Q.    Okay.  Just one second.  Let me

19   verify the exhibit's name.

20              MR. CAMPBELL:   This exhibit, Rose

21   Termination Document.

22                      - - -

23              Thereupon, a document was marked for

24   purposes of identification as Rose Exhibit 17.

25                      - - -

                                                    94

1    BY MR. CAMPBELL:

2           Q.    Okay.  Ms. Rose, do you recognize

3    this document?

4           A.    Yes.

5           Q.    And this is notifying you of your

6    termination on December 20, 2017?

                    Page 103

Rose Michelle 08.20.20

7          A.     Yes.

8          Q.     How were you notified of this?

9          A.     I was -- that was mailed to my

10   house.  I was notified of my termination by Cindy

11   Clark and Valerie Jaggie calling me from my office

12   on speakerphone during business hours terminating

13   me.

14          Q.     Okay.  What did they tell you during

15   the call?

16          A.     I'll be honest, I don't recall,

17   because I just was so upset that they would

18   humiliate me in such a way when the UH policy

19   states that this must be held at the utmost private

20   spectrum and privacy for any type of corrective

21   action or termination.  And they were calling me

22   from my own office during business hours while the

23   doctor was there, employees were there, patients

24   were there, and did this by speakerphone.

25          Q.     Okay.  Did your office at the

                                                        95

1   practice have a door on it?

2          A.     Yes and no.  It was right next to

3   the front desk, which had a window connecting, and

Page 104

Rose Michelle 08.20.20

4    you could hear everything.   And everybody heard.

5          Q.     Okay.  How do you know everybody

6    heard?

7          A.     I worked in the office for seven

8    years.  And for seven years it was always an issue

9    in the office that there was no privacy, because

10   you could hear all the phone conversations going

11   on.

12         Q.     Okay.  Let's go to the next page of

13   this termination document.  Did you ever see this

14   document laying out the grounds for your discharge?

15         A.     Yes.  That was mailed to me.

16         Q.     Okay.  Let's blow up Describe the

17   Circumstances portion of it.  All those paragraphs

18   there.

19                So, Ms. Rose, we just want to verify

20   some of these things that is UH's position and see

21   what your position is with respect to it.

22                First of all, we can agree that you

23   did get a final written warning on October 19,

24   2017, right?

25         A.     Yes.

96

1          Q.     Okay.  Now, the email on December

Page 105

Rose Michelle 08.20.20

2    12th and December 14th, what were those?

3           A.     UH would never produce them.  My

4    previous attorneys requested them and they would

5    never produce them.  And I was told I could not

6    have a copy, because I was no longer an employee.

7           Q.     Okay.  So you don't know what emails

8    you sent?

9           A.     On December 12th or 14th, no.

10          Q.     Okay.  So now let's go into the next

11   paragraph.  It says you went on a continuous leave

12   of absence beginning on December 15th.  We agree on

13   that, right?

14          A.     Yes.

15          Q.     Okay.  And then on December 19th,

16   Cindy Clark texted you to remind you that you

17   should not be working, do you recall that?

18          A.     Yes.

19          Q.     Okay.  And then as to what came

20   next, Cindy alleges that you started to text the

21   office staff; is that true?

22          A.     Yes.  I did send a text that's next

23   in line, but there was a following text after.

24   When I received the text from Cindy, I then reached

25   back out to the person I text and said, Never mind.

Page 106

Rose Michelle 08.20.20

97

1    I won't be able to do -- I can't quote it, because

2    I don't have it in front of me, but they neglected

3    to put that in there.  There was a second text to

4    the same person, which I have, that states, please

5    disregard, I'm not going to be able to drop those

6    off or get them to you, or something of that

7    nature, because Cindy has informed me via text that

8    I'm not allowed to work while I'm on STD.

9           Q.    Just to verify on these four bullet

10   points, did you text that information that's

11   quoted?

12          A.    No, I did not.

13          Q.    You did not.  You didn't text any of

14   those statements?

15          A.    The text that says, I need each of

16   you to call me, it's not -- so I don't know how to

17   explain this.  Cindy knows how this works.  When

18   you're a manager and you have to change each

19   employee's access to certain programs and systems,

20   you, as the manager, have to have their log-in,

21   their password, the last four digits of their

22   social security number, their favorite color, and

Page 107

Rose Michelle 08.20.20

23    their mother's maiden name.  And you have to have

24    this in order to go into and grant them access to

25    certain areas in each program.

                                                        98

1                 So with our systems changing, I was

2     telling the employees that I needed them to send me

3     that information for Athena, EMR and Soarian,

4     because I had to change all their information to

5     give them access to things they didn't have access

6     to prior.

7             Q.     Well, my question to you is pretty

8     simple.  As to each of those four bullet points,

9     there's quotes there, do you agree or disagree that

10    you sent text messages with those quotes?

11            A.     I agree, but there's not other

12    things that were said in the text with it.

13            Q.     Okay.

14            A.     For example, send all communications

15    to me by text, please and thank you.  Please let

16    Vida know that she can call me as she never texts,

17    so tell her to call me and not to email.  But it

18    also stated after that I am having a problem with

19    getting on the VPN at home, so I'm not able to get

20    my emails.

Rose Michelle 08.20.20

21        Q.    Let's go to the next paragraph.  It

22    says, At 1:50 p.m., Michelle was informed by Cindy

23    that she was not to be on hospital property unless

24    she was receiving medical attention.  Do you agree

25    with that?

                                                    99

1         A.    I can't quote the time, but, yes,

2    she did say that.

3         Q.    And then it states, the next one at

4    2:22, and, again, I understand you might not know

5    the time, but it says you sent a text to a

6    co-worker that stated, I have texted you, called

7    the office and left you voicemails and you need to

8    call me.  Did you do that?

9         A.    Yes.  But the time is not correct.

10        Q.    Okay.  And then if we go to the next

11    paragraph, Cindy then contacts Michelle via phone

12    to remind her that she was on STD and was not

13    supposed to be contacting her staff via email,

14    phone or text.  Did that happen?

15        A.    I don't recall.  I know I spoke to

16    Cindy, because I told her that I had to turn on my

17    out of the office for the email so that they would

Rose Michelle 08.20.20

21          Q.     Let's go to the next paragraph.  It

22     says, At 1:50 p.m., Michelle was informed by Cindy

23     that she was not to be on hospital property unless

24     she was receiving medical attention.  Do you agree

25     with that?

                                                        99

1          A.     I can't quote the time, but, yes,

2     she did say that.

3          Q.     And then it states, the next one at

4     2:22, and, again, I understand you might not know

5     the time, but it says you sent a text to a

6     co-worker that stated, I have texted you, called

7     the office and left you voicemails and you need to

8     call me.  Did you do that?

9          A.     Yes.  But the time is not correct.

10          Q.     Okay.  And then if we go to the next

11     paragraph, Cindy then contacts Michelle via phone

12     to remind her that she was on STD and was not

13     supposed to be contacting her staff via email,

14     phone or text.  Did that happen?

15          A.     I don't recall.  I know I spoke to

16     Cindy, because I told her that I had to turn on my

17     out of the office for the email so that they would

                          Page 109

Rose Michelle 08.20.20

18   know who to contact.  And I also had to put a

19   voicemail thing on my phone so patients would know

20   who to call instead of me as well, because they

21   wouldn't get a call back.  Nobody mans my phone.

22            And she told me to contact IT

23   department and they could help me put a message on

24   the phone and she also told me they could help me

25   with putting out of the office on my emails as

100

1   well.

2            Q.    Okay.  Then it says, Approximately

3   five minutes later, Michelle called the office from

4   a blocked number and began yelling at one of the --

5   one of her staff members because she did not inform

6   her that Cindy was in her office.  Did I read that

7   right?

8            A.    Absolutely not true.

9            Q.    You --

10           A.    That is when I called -- that is

11   when I called the front office as a patient and

12   canceled my appointment with the doctor.

13           Q.    Okay.  And you didn't yell --

14           A.    After the phone conversation with

15   Cindy, after that phone conversation with Cindy,

Page 110

Rose Michelle 08.20.20

16   that is when I called the office directly and

17   canceled my appointment as a patient.

18          Q.     Okay.  Did you schedule a false

19   appointment just to be able to enter the property?

20          A.     No, absolutely not.  My appointment

21   was made even before I went on FMLA.

22          Q.     Did you -- you had an unemployment

23   hearing after your discharge, correct?

24          A.     I had -- yes, I did.

25          Q.     You represent in the unemployment

                                                      101

1    bureau that you didn't do any of this, you just

2    went in for a medical appointment, right?

3          A.     No, that is not true.

4          Q.     Did the decision make it appear to

5    be that that was your testimony?

6          A.     No.  That is not true.  I have --

7          Q.     We'll see.  And then on the last

8    paragraph, it says, The staff are very nervous and

9    concerned about her behavior for their own safety.

10          Did any of the staff members tell

11   you that they were concerned with what you were

12   doing?

Page 111

Rose Michelle 08.20.20

12   too.  It says, Michelle, thank you, Julie.

13   BY MR. CAMPBELL:

14        Q.    Just want to verify you did ask it

15   and UH confirmed that your insurance coverage was

16   through January 31, 2018, right?

17        A.    That's what her letter said and

18   that's what her email said, but that's not what

19   happened.

20        Q.    Okay.  Just so -- just so we're

21   clear, you didn't do anything in return for UH

22   extending your insurance to the end of January

23   2018, right?

24        A.    I don't understand what you're

25   asking.

                                            112

 1        Q.    You didn't sign a release, right?

 2        A.    The release was going to be -- if I

 3   signed the release, they would have kept it open

 4   until February 2018.

 5        Q.    Simple question.  You didn't sign

 6   the release, right?

 7        A.    Correct.  So I was told I'd have

 8   insurance through the 31st of January and I did

 9   not.

Page 123

Rose Michelle 08.20.20

10          Q.      Did you pay any money to UH to

11     extend your benefits through January?

12          A.      She offered it through January.

13          Q.      Did you do anything in return to get

14     the insurance in January from UH?

15          A.      I don't understand.

16          Q.      Did you give anything to UH for it

17     or was it a gift that they were giving to you?

18          A.      It was not a gift.  They fired me

19     while on leave from a medical procedure and the

20     doctor that works for UH had stated she needs seven

21     weeks of physical therapy at least.  So they are

22     going by what the surgeon recommended.

23          Q.      Ms. Rose, did you give any -- your

24     benefits -- this will be real simple.  Your

25     benefits were supposed to end on December 31,

113

1     right?

2          A.      If that's how it works, yeah.  I was

3     terminated on the 20th.

4          Q.      Okay.  So did you give anything for

5     UH to extend your benefits one more month?  Simple,

6     did you pay them money?

Rose Michelle 08.20.20

```
 7          A.     No.

 8          Q.     You didn't sign a release, right?

 9          A.     The release wasn't about that.

10          Q.     You didn't give them anything.  Is

11   there anything that you gave to UH in return for

12   that one month of benefits?

13          A.     I didn't receive the one month of

14   benefits, but no.

15          Q.     Okay.  You didn't give them

16   anything, okay.  Now, let me just -- we can drop

17   out of there, Jeff.

18                        - - -

19                 Thereupon, a document was marked for

20   purposes of identification as Rose Exhibit 22.

21                        - - -

22   BY MR. CAMPBELL:

23          Q.     I just want to go through with

24   you -- we're just about wrapped up here.  I just

25   want to ask you a couple of questions as to it.
```

114

```
 1                 With respect to your harassment

 2   complaint, what is the micromanaging of emails

 3   about?

 4          A.     Cindy Clark sent me an email stating
```

Page 125

Rose Michelle 08.20.20

whatsoever in the event of this litigation.

14            IN WITNESS WHEREOF, I have hereunto set

my hand and official seal of office at Columbus,

15  Ohio, this 6th day of September, 2020.

16

17

18

19

/s/Linda A. Schilt, RPR_____

20  Notary Public, State of Ohio

21

My Commission Expires:  July 29, 2024.

22

23                 - - -

24

25