Case: 1:20-cv-00132-JG Doc #: 36 Filed: 10/16/20 1 of 11. PageID #: 428

FILED
4:15 pm Oct 16 2020
Clerk U.S. District Court
Northern District of Ohio
Cleveland

IN THE UNITED STATES DISTRICT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

**MICHELLE ROSE**                             **CASE NO. 1:20-CV-00132**
**Plaintiff, Pro Se**

V.                                                          **JUDGE: JAMES S. GWIN**

**UNIVERSITY HOSPITALS**

**PHYSICIAN SERVICES, INC**

**Defendants**

## RELEVANT AND DISPUTED FACTS TO DEFENDANTS MOTION FOR SUMMARY JUDGEMNT.

**A. Plaintiff's General Employment History With Defendant.**

*Plaintiff was employed by Defendant from 2004 until December 20, 2017 (Dep.*

*Plaintiff at 31)*

**DISPUTE:** I started employment with University Hospitals Physician Services in March of 2011. Prior to March of 2011, I was employed by University Hospitals Corporation from 2004 until March of 2011. When employed by UHC, you are paid by the hospital and employed with the hospital. When you are an employee of UHPS, your salary, insurance, benefits and vacations are paid 100% by the physician that has hired you. UHPS physicians receive no support financially at all from UHC. They have to pay rent to use the space and they pay 100% of all their employees' salaries and benefits as well purchasing any and all supplies and or equipment used in the practice.

*Plaintiff admits that she was familiar with Defendant's FMLA policy and*

*that she utilized FMLA leave on a number of occasions during her employment. (Dep.*

*Plaintiff at 39, 44, 51-52 and 88-90, and Ex. 4).*

**DISPUTE:** I have never utilized FMLA and or STD while employed by UHC. I filed my very first FMLA on July 18, 2017 for my own personal health issues. (Exhibit A, A.1, A.2, A.3 and A.4)

*Consistent with her happiness, Plaintiff never filed a complaint with the human resources*

*department. (Dep. Plaintiff at 39).*

**DISPUTE:** I contacted Valerie Jaggie in HR regarding the neglect of training for our billing person in the office. Dr. Kent Knauer was not contracted to utilize the CBO (Central Billing Office) and after discovering multiple mistakes and write offs, he decided to hire a full time office billing person and not utilize the CBO. After many attempts of requesting this from my supervisor, Dr. Knauer wanted to take it to a higher level. (Exhibit B, B.1, B.2, B.3 and B.4)

*Due to a change in federal law, Plaintiff was paid hourly*

*as a Practice Lead. (Dep. Plaintiff at 38). As Practice Lead, Plaintiff was responsible for*

*handling a variety of administrative tasks for Dr. Kent Knauer's medical office. (Dep. Plaintiff*

*at 35-37).*

**DISPUTE:** The Labor and Employment Law reads as follows: The United States Department of Labor on September 24, 2019, issued a final rule increasing to $35,568.00 minimum annual salary requirement that many employees need to meet to be exempt from being paid overtime. The final rule goes into effect on January 1, 2020.

At this time, my annual salary was $61,609.60 and therefore the new law did not apply to me and my position at all. However, I received a letter on August 7, 2017 notifying me that my new role would Practice Lead and I would now be an hourly employee. They made up a new job description for this new created role.

According to the new pay scale for Practice Lead, I would never receive another raise while employed with UHPS as the max/cap at the new position was $24.19 per hour and I was at $29.62 per hour. It would also never be able to be placed in the newly created Practice Supervisor because that newly reacted role stated you must have 10 or more employees in the practice that you are overseeing and I had only 5 because the practice was only one physician. (Exhibit C, C.1 and C.2, C.3 and C.4)

**B. Plaintiff Was Counseled In July, 2017 By Her Supervisor.**

*In July, 2017,*

*Plaintiff's supervisor worked with the human resources department to counsel Plaintiff on a variety of issues. (Dec. Jaggie at 14-15 and Ex. 2). The need for the communication resulted*

4831-4510-7147.1 5

*from employees from other departments raising Plaintiff's communication issues to Plaintiff's supervisor. (Dec. Jaggie at Ex. 2).*

*The July, 2017 counseling addressed the chain of command, communication style, and the need to report all hours worked. (Dec. Jaggie at Ex. 2).*

**DISPUTE:** I have never had any such counseling in July of 2017. I have never seen and I have never signed anything pertaining to being counseled in July of 2017. Policy and Procedure HR-72 – Corrective Action clearly states that each corrective action will be documented with the reason, the action plan and a signature by the employee, his/her manager and or immediate supervisor.

It also states that all corrective actions are to be distributed to the employee, the department manager and Human Resources, for inclusion of the employees file. I have requested any and all documents in my employee file and I have nothing at all regarding a "counseling on a variety of issues"? (Exhibit D.4. D.5, 5.1, 5.2, 5.3, D6, 6.1, D7 and D9)

**C. Plaintiff's Performance Following The Counseling Did Not Improve.**

*Plaintiff violated GM-69 in August, 2017 by executing a one year contract with a transcription service. (Dep. Plaintiff at 63-64 and Ex. 12; Dec. Jaggie at 21).*

**DISPUTE:** Dr. Kent Knauer approached me in July of 2017 asking me to please find him a dictation service as he could no longer keep up with the new patient letters that needed to be dictated by him. I emailed my supervisor Cynthia Clark asking her if she was aware of any practices still utilizing dictation services and if so, whom. She responded to my email stating that she knew there were practices that were still using an outside dictation service, but she could not recall what s3ervice and or which practices at UHPS. She advised me to look on the UHPS Oracle system under SSI (Self Service Invoicing and search for approved vendors.

Dr. Knauer asked me to please reach out to the manager for Dr. Willem Van Heeckeren which is another UHPS physician in the Oncology Department. Dr. Knauer received dictated letters on patients they shared and was impressed with this dictated letters. So I called his office manager

and asked what service they utilize for his dictated letters. She told me the name of the service and emailed me the name of the company, the contact, phone and email.

I then pulled up the Oracle system and typed in the company and they were in there as an approved vendor. I called and spoke to the owner/operator and she told me that they do service for many different practices at UH. She sent me the contract along with a list of materials needing to be purchased for the dictation services and I placed them all on Dr. Kent Knauer's desk.

After a few days, the contract was placed back on my desk with a sticky note stating OK. That was Dr. Knauer's way of letting me to know to move forward. I then signed the contract on behalf of Dr. Kent Knauer and ordered the materials needed to start. She then emailed a link to both Dr. Knauer and I telling us to contact the IT department to have them download the software that was needed in order to transfer files back and forth.

I started this process and was being told no, that were could not have this downloaded onto our system. The company was in the UHPS Oracle System as an approved vendor, so one could only assume that the contract has been reviewed, approved and fine to sign or they would not be utilized by other UHPS physicians and they would not be an approved vendor in the Oracle system.

I reported this to Dr. Knauer and he demanded to speak to someone in the IT department that was in charge and I did contact the manager and explained the situation. Three months later, Valerie Jaggie attempts to use that against me on my final warning corrective action dated October 19, 2017.

Dr. Kent Knauer will be called as a witness and can testify and confirm everything I have stated above. Tammy P. Gunya, President and CEO of Premier Office Technologies, Inc. will also be called as a witness to confirm the above statement and to confirm that her company has multiple UH contracts with physicians and or departments at least at that time in 2017.

(Exhibit E, E.1, E.2, E.3, E.4, E.5 and E.6. E-7.6, E-7.9 number 4, 4.1 and 4.2.1. Exhibit E-5.3 and Exhibit E-6)

*Shortly thereafter, Defendant announced that the Allergy Department would be*

*changing its billing and scheduling software. (Dep. Plaintiff at 57; Dec. Jaggie at 22). Dr.*

*Knauer's practice was in the Allergy Department and Plaintiff objected to the timing of the*

*change. (Dep. Plaintiff at 57). Plaintiff was upset because no one consulted with her on the*

*date the change would be implemented. (Dep. Plaintiff at 57).*

**DISPUTE:** In the fall of 2016, the director Brian Boardman and supervisor Cynthia Clark met with both Dr. Kent Knauer and I in the office to discuss the change of systems for the practice. They brought Dr. Knauer's last year's financials to review and determine what would be the best time for the Allergy department to go through training and go live in the new system. We all agreed that the winter of 2018 would be best as that is the slow time of the year for allergies and it would not interfere with patient care. Our director Brian Boardman even went so far as to make a statement that would be a good time as "they should have all the kinks worked out".

I then had a meeting with the staff and discussed our schedule for go live and training in the new system. I told them to please plan accordingly as there would be no approved vacations and or time off during that 3-4 month period of time. So each employee made arrangements for any doctor's appointments, vacations and or time off that they would need prior to the dates of training and go live in the winter of 2018.

I had an MA fill out an FMLA for October of 2017 as her daughter would be having surgery and she needed to be gone for two weeks. I myself as the manager, scheduled my FMLA for my scheduled knee surgery for November 27, 2017. This way Dr. Knauer and I both agreed to attend the training all at the same time while he normally is out on vacation anyway and it would not interfere with anything.

Then I started receiving updated emails on the practices that have gone live in wave 1. Before we knew it, our department without telling us ahead of time and or checking with the physician himself, decided to move all practices up to go live dates. We were now scheduled for training and go live right in the middle of all the planned FMLA time off for surgeries. I also received horrible new in late August of 2017 that my father had pancreatic cancer and I was on intermittent FMLA for his weekly appointments for blood work and chemo at the VA Medical Center. I explained this to Dr. Knauer and he also voiced his opinion via emails and I did everything I could begged and pleaded our desperation not to be pushed up and allow us to keep our original go live date. (Exhibits F and G). Dr. Kent Knauer, Cynthia Clark will both be called as witnesses as well to testify to this.

*The IT Department reported that Plaintiff was on the "warpath." (Dep. Plaintiff at Ex. 15, pg. 11). Plaintiff demanded a meeting with a "heavyweight" to discuss the issues. (Dep. Plaintiff at Ex. 15, pg.*

**DISPUTE:** They are mixing facts with emails and vice versa. The above had nothing at all to do with the program changes and go live dates; it refers back to the dictation company that Dr. Kent Knauer signed a contract with and the IT department refusing to install the hardware on his laptop. Please note the email from Jerry Condron clearly states that "the physician, Dr. Kent Knauer, wants an audience with a heavyweight"

Nowhere in this email did it state that Michelle Rose and or the Office manager is a warpath and or demanding a meeting with anyone. Also please note at the top of that email, Dr Hertz

forwarding the email to Valerie Jaggie as if I did something wrong and plotting my corrective action 6 days later. (Exhibit H)

*The IT Department advised Plaintiff's supervisor that Plaintiff's "barrage" e-mails and*

*phone calls are "time-consuming and inflammatory." (Dep. Plaintiff at Ex. 15, pg. 33).*

**DISPUTE:** I was told by Cindy Clark, my supervisor to work with Kali on any issues and or problems that needed addressed on the new Sorian program. It is not my fault that the system was not working properly and the physician's schedules were messed up and it was causing many problems with patient care. So when you have a lot of problems, there are going to be a lot of calls and or emails regarding all the issues.

*Finally, Plaintiff's objections included multiple threats to take her objections to UHHS' Chief*

*Executive Officer. (Dep. Plaintiff at Ex. 14, pg. 2).*

**DISPUTE:** There was one email on Wednesday September 27, 2017 at 12:34pm addressed to Cindy Clark, Brian Boardman and Dr. Kent Knauer replying to Dr. Knauer's email prior about the office going to crash and burn if we are forced to move forward without staffing. (Exhibit G.2) Dr. Knauer and I met to discuss this matter further and I was instructed to take this to a higher level as things were falling on deaf ears.

After this meeting, I sent the responding one and only email stating that I would take this matter up the ladder to Dr. Drew Hertz supervisors and if that feel on deaf ears, I would try to schedule a meeting with Mr. Zenty himself. We were being pushed up in our scheduled go live without any communication prior and we were originally scheduled to go live in the fall/winter of 2018. (Please refer back to Exhibit G.1, G.2, G.3 and G.4)

*Due to the contract and the inappropriate objections to the software implementation,*

*Plaintiff was placed on a Final Written Warning on October 19, 2017. (Dep. Plaintiff at Ex.*

*11).*

**DISPUTE:** Dr. Knauer instructed me to sign the contract in early August of 2017 and they were in the UH Oracle system as an approved vendor and utilized by other UHPS physicians.

How can you use that in a corrective action when they were approved by UH and this was signed August 18, 2017 and trying to reprimand someone three months later goes against their own UH policy and procedures.

The real reason for my corrective action is due to the email I sent on October 13, 2017 which to Valerie Jaggie and copied Dr. Drew Hertz and all of his superiors above him pleading with them not to push our practice up to go live a year earlier than originally scheduled and without

consulting with us prior. Dr. Hertz replied to that email stating **"it is Dr. Knauer's job as the lead physician to take things over my head, not you"**.

This email took place on Friday October 13, 2017 and on Tuesday October 17, 2017, is when I started getting emails from Valerie Jaggie the HR manager singling me out from all other practice leads and practice supervisor on my time card. She indicated in the email "You are receiving this email as there was an issue that was discovered and it needs your attention". "This change is only for your timecard". I responded to her email quoting the UH policy and procedure that no employee should be approving their own time.

The email chain continued through Wednesday October 18, 2017. After the back and forth regarding this matter, Valerie Jaggie then sent out a group email to ALL practice leads and practice supervisors changing the rules for them as well, she knew that she was just singling me out and it was harassment. The very next day Thursday October 19, 2017 I had Valerie Jaggie and Brian Boardman show up in my office and present me with my final warning corrective action.

According to policy and procedure HR-72-Corrective Action, they had no cause for presenting me with a Final Warning corrective action and this according to their policy should have been a confirmation of counseling and at most a warning. (Exhibits I though K.6)

*Plaintiff admits that Dr. Knauer and her supervisor directed her*

*not to work during her FMLA leave. (Dep. Plaintiff at 92-93, 96, and Ex. 16).*

**DISPUTE:** Dr. Knauer only advise me not to come into the office on December 20, 2017 for my scheduled appointment with him. He sent that via text message warning me that all eyes are on me. Cindy Clark only warned me not to be working while on leave and that started on December 19, 2017.

Prior to that, Cindy Clark was email me, calling me, and asking me to conduct work and get it back to her during both of my FMLA leave for four weeks at the VA with my father and also during my STD for my knee surgery November 27, 2017. (Exhibits L, L.1 and L.2)

*Plaintiff's communications included requests for her staff to send her*

*their login and password information for a variety of computer systems. (Dep. Plaintiff at 97-*

*98 and Ex. 19).*

**DISPUTE:** When you are the manager, you have the access to control all employees' user access in all systems. In order to change that access, you must have their Full name, DOB,

Favorite Color, Mother's Maiden Name and the last 4 numbers of their social security numbers. My staff COMPLETEY understood exactly what it was I was requesting from them and I just worded it incorrectly.

I had to change each and everyone's security level access in Athena, Sorian and the EMR. If I was attempting to utilize one of my employees log in and or passwords in order to hide the fact that I was working, I would only need this from one employee and not each and every one of them. (Exhibit M and M.1)

*The communications asked the staff not to advise Plaintiff's supervisor and to*

*email the information to Plaintiff's personal email address. (Dep. Plaintiff at Exs. 18-19).*

**DISPUTE:** I do not see or recall anywhere telling them to not advise my supervisor? And I only requested for them to use my Mellis4702@aol.com because I lived at the time 900 feet in the woods in LeRoy Township and had a lot of difficulty with my internet and trying to log onto the UH VPN. I even called the Help Desk per the advice of my supervisor Cindy Clark. I had requested copies of these emails and I have not received them.

*The craziness was, in part, due to Plaintiff calling*

*the office from a blocked phone number to speak with one of the employees. (Dep. Plaintiff at*

*Exhibit 17). While on the call, Plaintiff yelled at the co-worker for saying her name aloud and*

*questioned the employee as to where they had been that day. (Dep. Plaintiff at Exhibit 17).*

**DISPUTE:** After the advice from Dr. Knauer not to come into the office on December 20, 2017, I called the appointment line in order to cancel my appointment that was scheduled for the next day. I was calling the office as a patient and not any other reason. I had to call from my home landline phone because my cell phone was dead and charging and my landline was a private number not blocked.

*Based on Plaintiff's violation of the Final Written Warning, Defendant's policies, and*

*the directives given to Plaintiff, Plaintiff was discharged on December 20, 2017. (Dep.*

*Plaintiff at Ex. 17).*

**DISPUTE:** I did not violate anything in the "final warning corrective action" They are stating that on 12/12/17 and 12/14/17, I sent "several unprofessional emails to her manager, staff and co-worker in another department". I have requested these "several unprofessional emails" and I was sent two emails. (Exhibit O through O.4) So sorry that Exhibit O is in between M & N

*Due to Plaintiff's leave status, Plaintiff was notified of the discharge over*

*the phone. (Dec. Jaggie at 27). Defendant's employees were careful to verify no one could hear the call. (Dec. Jaggie at 27).*

**DISPUTE:** Per UH Policy & Procedure HR-72 – Corrective Action Number 4 "All corrective action discussions will be conducted in a setting that assures privacy". Not only did they discharge me over the phone but they had me on speaker phone during clinic and business hours. My office sets up front right in the middle of the front desk and the patient's shot room. Denise

Novosel will testify to the fact that my office was not private at all with the door opened and or closed. It also had a small window facing the front desk and everything could be heard. We have a very private conference room inside that building and they could have called me from that conference room where it would have been private. Or they could have called me from their vehicles once they left the office building. (Exhibit D number 4).

*Plaintiff's health insurance was scheduled to end at the end of December, 2017 due to her discharge date. (Dec. Jaggie at 31). However, at Plaintiff's request, Defendant extended the coverage through the end of January, 2018. (Dec. Jaggie at 31-32). Plaintiff did not give anything in return for this action. (Dep. Plaintiff at 112-113; Dec. Jaggie at 31). Defendant complied with is promise. (Dec. Jaggie at 32). However, due to the fact that January was the beginning of the calendar year, Plaintiff's deductible started at zero again; requiring Plaintiff to pay out-of-pocket for certain healthcare in January. (Dec. Jaggie at 32).*

**DISPUTE:** I reminded Valerie Jaggie that she was ending my insurance only after 4 weeks post op reconstructive knee surgery and I have not been cleared by my surgeon. I told her via phone call that I was scheduled to see him again on 12/29/2017. She said to let her know what the outcome of that office visit was with the surgeon.

I sent her an email on 12/29/2017 with a screen shot of what my surgeon has ordered for me. I sent a second email on 1/2/2018 as I still have not heard from Valerie Jaggie and or Cindy Clark regarding my surgeon's notes. On Wednesday January 3, 2018 at 3:14pm Valerie Jaggie sent me an email regarding moving my term date to 1/1/18 and that would give me coverage to the end of January and then I would also receive Cobra information for a later date.

She then stated in her email "If you would like to discuss benefits past this point we could speak about a separation agreement with a release of liability for UH". She asked for my response no later than 1/10/18. I then received a call from both Cindy Clark and Valerie Jaggie to discuss the separation agreement and signing a release of liability for UH. I declined their offer on 1/11/18 and I never had coverage again.

You can see that in the multiple emails, text messages and I have around 12 recorded phone calls to support this fact for evidence as well. Terri Steel-Austin, my nurse case manager at Health Design Plus which was our UH owned insurance company will be called as a witness and will also testify to the fact that this insurance coverage was never taken care of and I never received the proper care after my surgery which resulted in a third surgery May of 2020.

If UH would have supplied me with the documents that were requested from them, it would prove that I did not change my insurance plan in 2017, I was on Consumer Select Plan in 2016 and again in 2017. I also had over $1,300.00 in my HAS so paying my out of pocket deductible was not an issues at all. Again, Terri-Steel-Austin from Health Design Plus will confirm all this in her testimony and also has in my recorded phone calls.

I have a recorded call to my Primary Care Physician in January denying me an office visit as my health insurance in the system was showing termed and no coverage. Terri Steel-Austin had to call my PCP's office for me to tell them the situation and to allow me to be seen. (Exhibits N through N.15)

*In addition, due to the fact that Plaintiff was working during her FMLA leave, Defendant asked Plaintiff to report any hours worked during that FMLA leave. (Dec. Jaggie at Ex. 2). In fact, Plaintiff was asked to report any hours of the clock from November, 2016 – when Plaintiff moved to hourly – until her discharge. (Dec. Jaggie at Ex. 2). Plaintiff never responded to the email so Defendant paid Plaintiff for hours worked during the FMLA leave based on her computer login information. (Dec. Jaggie at Ex. 2).*

**DISPUTE:** I did not answer this only due to the fact that I had no idea how to answer this. I was on a continuous FMLA leave from October 21, 2017 through November 16, 2017 at the VA hospital and attending to my father's untimely death and funeral. Valerie Jaggie was obviously not made aware that my initial intermittent FMLA for my father, turned into a continuous FMLA leave for four weeks.

Cindy Clark, Brian Boardman, Dr Drew Hertz, Dr. Knauer and my staff were all well aware of this. I had a conference call from the VA with Brian Boardman, Cindy Clark and Dr Hertz. Both Brian Boardman and Cindy Clark was not only aware that I was continuing to work while on continuous FMLA leave, they gave me work to do and also requested that I attend a 2 day class for Non CBO billing offices.

I attended these classes while on continues leave and continued to receive emails from Cindy Clark and Brian Boardman. I then never gave it a second thought at all when I was on continuous leave again from November 27, 2017 through my termination date of December 20, 2017. Again I was receiving emails from both my supervisor and my director regarding work and asking me to complete tasks. (Exhibits P through P.8)

Respectfully submitted,

*Michelle M. Rose, Pro Se*

Michelle Marie Rose, Pro Se Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this day 16th day of September 2020, the foregoing was filed through the Court's CM/ECF electronic filing system. A copy of this filing will be send via email to the Defendant's Attorneys.

David A. Campbell (0066494)
Donald G. Slezak (0092422)
Lewis Brisbois Bisgaard & Smith, LLP
1375 E. 9th Street, Suite 2250
Cleveland, Ohio 44114
David.a.campbell@lewisbrisbois.com
Donald.slezak@lewisbrisbois.com

Attorneys for Defendant